1

2

3

4

5

6                       IN THE UNITED STATES DISTRICT COURT

7                          FOR THE DISTRICT OF ARIZONA

8

9    Dale William Ray Farmer,                    No. CV-13-00255-TUC-JGZ (BPV)

10                              Plaintiff,        **REPORT AND RECOMMENDATION**

11        v.

12   Carolyn W. Colvin, Acting Commissioner
     of Social Security,

13                              Defendant.

14

15          Plaintiff, Dale William Ray Farmer, filed this action for review of the final

16   decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Plaintiff

17   presents three issues on appeal: whether the Administrative Law Judge ("ALJ") erred by

18   failing to give controlling evidentiary weight to the treating and examining providers; (2)

19   whether the ALJ properly evaluated and weighed the opinion of the March 13, 2009

20   consultative examiner; and (3) whether the ALJ found clear and convincing reasons for

21   an adverse credibility finding. (Doc. 18.) Pending before the court is an Opening Brief

22   filed by Plaintiff (Doc. 18), the Commissioner's Opposition (Doc. 20), and Plaintiff's

23   Reply Brief (Doc. 21). Pursuant to the Rules of Practice of this Court, this matter was

24   referred to Magistrate Judge Bernardo P. Velasco for a Report and Recommendation.

25   (Doc. 5.) Based on the pleadings and the administrative record submitted to the Court, the

26   Magistrate Judge recommends that the District Court, after its independent review, affirm

27   the decision of the ALJ.

28

## I.     Procedural History

Plaintiff filed an application for Supplemental Security Income ("SSI") on October 1, 2008, with a protective filing date of September 25, 2008, alleging an onset of disability beginning July 1, 2007 due to a seizure disorder. Transcript/Administrative Record ("Tr.") 83, 158-67, 220. The application was denied initially and on reconsideration. Tr. 78-79. A hearing before an ALJ was held on October 20, 2010. Tr. 35-54. The ALJ issued a decision on November 10, 2010 finding Plaintiff not disabled within the meaning of the Social Security Act. Tr. 83-88. The Appeals Council granted a request for review and vacated the hearing decision and remanded the case to the ALJ for additional evidence and further evaluation. Tr. 91-93.

On remand, a second hearing was held before the ALJ on February 7, 2012. Tr. 55-77. The ALJ issued a decision on March 9, 2012 finding Plaintiff not disabled. Tr. 13-26. This decision became the Commissioner's final decision when the Appeals Council denied review. Tr. 1-3. Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). (Doc. 1)

## II.     The Record on Appeal

### a.   Plaintiff's Background and Statements in the Record

Plaintiff, forty (40) years of age at the date of the ALJ's March 2012 decision, completed the eleventh grade in school with past relevant work in construction and maintenance. Tr. 59-60, 63, 212.

Plaintiff testified at a hearing before the ALJ on October 20, 2010 that he had worked most recently growing and harvesting tomatoes in a greenhouse from August 2009 until January or February, 2010. Tr. 41-42. Plaintiff testified he was laid off in December, and again in February because there was no more work. Tr. 42.

Plaintiff first started having seizures when he was eleven years old. Tr. 44. He testified that he felt he could no longer work because he was having seizures two to three times a week, including grand mal seizures with strokes. Tr. 44. Plaintiff acknowledged that he went through a period, a year and three months before December 2008, when he

did not have any seizures. Tr. 44. Plaintiff testified that the seizures were becoming more frequent, causing Plaintiff to lose function of the right side of his body, and taking him a day to a week afterwards to fully recover. Tr. 48-49.

Plaintiff also testified that in addition to the seizures, he had one leg that was half an inch shorter than the other, and problems with his knee from a torn meniscus. Tr. 44-45. Plaintiff wears lifts for the leg length discrepancy and gets shots in his knee for the knee problem. Tr. 44-45. Plaintiff also has migraine headaches once or twice a month, sometimes as frequently as two times a day, which cause nausea, vomiting, and blurred vision. Tr. 47-48.

On a daily basis, Plaintiff cares for his infant daughter, feeds his dogs and picks up his yard. Tr. 45. He doesn't watch television, but reads newspapers, goes grocery shopping, helps with laundry, and cooks all the time. Tr. 45-46. Plaintiff does not drive. Tr. 50.

Plaintiff takes Depakote and Topamax, and has side effects from his medication consisting of drowsiness, sleepiness and numbness. Tr. 50. Plaintiff has monthly checks on his Depakote levels, and reports his seizures to his doctor. Tr. 51-52.

Plaintiff testified at the second hearing, on February 7, 2012 that he was laid off in February 2010 from the greenhouse because of his seizures. Tr. 63. When Plaintiff asked his doctor what to do about it, his doctor told him no more work. Tr. 64.

Plaintiff testified at the second hearing that his seizures were occurring more frequently, up to three to four times a week, and lasting for up to 25 to 45 minutes. Tr. 65-66. After a seizure he feels "sick", his muscles are tired, he is weak, and can't really walk. Tr. 67. Additionally, he loses memory. *Id*. Plaintiff testified that he also has headaches two to three times a week. *Id*.

A vocational expert ("VE") testified that Plaintiff's past relevant work was unskilled. Tr. 73. The VE testified that if Plaintiff could perform at all exertional levels, with the avoidance of hazards, dangerous machinery, and heights, and was further limited

to simple, unskilled work, he could work as a janitorial cleaner, classified as light and unskilled work, and as a dishwasher, classified as medium, unskilled work. Tr. 72-73.

The VE testified that the tolerable absenteeism rate for the simple, unskilled work described by the VE would typically be 10 to 12 days a year. Tr. 74. Absences of two to three days a month would result in termination. *Id*. The VE further testified that there would be no work if an individual with the same age and education as Plaintiff had moderate difficulties understanding, remembering and carrying out short, simple instructions, and interacting appropriately with the public, co-workers, or supervisors; marked difficulties understanding and remembering detailed instructions, responding appropriately to work pressures in the usual work setting, and difficulties staying on task, due to malaise and who was "off task" for two hours every day and had two to three days of absenteeism. Tr. 74-75.

The VE further testified that there would be no work if an individual with the same age and education as Plaintiff had moderate difficulties: understanding and remembering simple or detailed instructions; carrying out detailed instructions; with attention and concentration for extended periods; completing a work day without symptoms or the need for rest; interacting with the general public; dealing with instruction or criticism from a supervisor; getting along with co-workers; and maintaining socially appropriate behavior. Tr. 75-76.

b.  Relevant Medical Evidence Before the ALJ

i.  *Treating Sources*

Plaintiff was seen in 2004 and from 2007 to 2009 at Hidalgo Medical Services in Silver City, New Mexico. Tr. 275-80. In October 2004 Plaintiff reported to his treating physician that he had been prescribed Depakote for seizures, but had stopped taking the medication one and a half months prior to the appointment. Tr. 280. Plaintiff reported no seizures since discontinuation of Depakote (valproic acid), but did report feeling strange and having one fainting spell. *Id*. Plaintiff was prescribed Depakote and returned in November 2004 for a follow up visit and to check his Depakote levels. Tr. 280-81.

1   Plaintiff reported having some black-out incidents, but attributed these to his Depakote
2   prescription running out. Tr. 279. After restarting on Depakote, he had no seizures or
3   black-outs. *Id*. In December 2004, Plaintiff reported being seizure free while taking
4   Depakote. Tr. 278.

5       In May 2007, Plaintiff reported to that  his last seizure was 11 months previous.
6   Tr. 277. Plantiff's Depakote prescription was refilled and he was referred to James
7   McCabe, M.D., to continue care and to order an EEG.  *Id*.

8       In June 2007 Plaintiff reported to Dr. McCabe that his last seizure was in March
9   2007, and that he occasionally takes extra Depakote to prevent seizures. Tr. 275. Plaintiff
10  reported episodes of confusion in the week prior to the visit. *Id*. Dr. McCabe prescribed
11  Depakote and referred plaintiff for an EEG. Tr. 276.

12      Between July 2007 and November 2008, records from Hidalgo Medical Services
13  indicate that Plaintiff did not show for scheduled office visits in July 2007, and canceled
14  one visit and did not show for another scheduled office visit in June 2008. Tr. 309. There
15  are no records of any other visits to Hidalgo Medical Services during this time.

16      Records from Carlsbad Medical Center indicate that he was seen in October 2007
17  in the emergency department for treatment of possible seizure activity. Tr. 289. Plaintiff
18  reported missing four days of his prescribed seizure medication. Tr. 291. Plaintiff
19  reported having only one seizure in the past year and none for the past two months. Tr.
20  290-91. Plaintiff was discharged from the emergency room the same day, stable and
21  walking, with instructions to restart his Depakote. Tr. 291-92.

22      In December 2008 Plaintiff reported to Alison Gomez, M.D., that he had a
23  "breakthrough seizure" in September 2007. Tr. 310. He also reported not taking all of his
24  medication on some days, but taking extra doses when he feels a seizure is coming on. *Id*.
25  Dr. Gomez changed his Depakote prescription from a dose of 250 milligrams four times
26  daily to a dose of Depakene ER 1000 milligrams once daily to improve compliance. Tr.
27  310. Plaintiff's Depakote levels were tested and found to be below therapeutic range. Tr.
28

- 5 -

314. Additionally, Dr. Gomez noted that Plaintiff had not had the EEG done. Tr. 310. Plaintiff did not show for a January 2009 follow up appointment. Tr. 309.

In March 2009 Plaintiff was seen at Gila Regional Medical Center emergency room, and though the record of the visit is incomplete, Plaintiff was instructed to follow up with his physician and take his medications as directed, and to return to the emergency room if his symptoms worsened. Tr. 332.

In April 2009 Plaintiff received emergency treatment after reportedly having a seizure at work.  Tr. 452.

In May 2009, Plaintiff was seen by Jeffrey Bushman, D.O., to reestablish care. Tr. 364. Plaintiff reported to Dr. Bushman that he had a "big seizure a week ago." *Id*. Plaintiff reported he was currently taking Depakote 250 milligrams three times a day, and it was "doing okay for him." *Id*.

In July 2009, Plaintiff again received emergency treatment for a seizure, but was discharged as stable that same day. Tr. 445-47.

In September 2009 Plaintiff reported to Dr. Bushman that he was having about 5 migraines a month, and Ibuprofen and Excedrin were not helping. Tr. 363. Plaintiff reported having a seizure a month prior to the visit, and having had 3 seizures since May 2008. *Id*. Dr. Bushman prescribed Maxalt and Topamax, to help with both the migraines and the headaches. *Id*. Lab results from September showed that Plaintiff's Depakote levels were "very low." Tr. 365-66.

In October 2009 Plaintiff reported to Dr. Bushman having his last seizure a month prior, and that the Topamax and Maxalt were helping with his migraines. Tr. 362. Plaintiff's Depakote levels were quite low, and Plaintiff reported having decreased his dosage due to complaints of fatigue and "zoning out." Tr. 382. Dr. Bushman encouraged Plaintiff to take his medication, informing him that he would build up a tolerance to it and the side effects would go away. *Id*.

At a second appointment with Dr. Bushman in October 2009 Plaintiff reported fewer seizures with the increase in Depakote dosage, but that the Topamax was not helping his migraines much yet. Tr. 381.

In November 2009 Plaintiff reported having fewer seizures and migraines since taking his prescribed medication, but still having some. *Id*. Dr. Bushman deferred adjusting his medication further as Plaintiff had an appointment to see a neurologist. *Id*.

In January 2010 Plaintiff was seen by Robert Foote, M.D., at the Center for Neurosciences in Tucson, Arizona. Tr. 358. Plaintiff reported two or three seizures a month, with the last reported seizure in October 2009. *Id*. His Depakote dosage was increased at that time, and Topamax was added. Plaintiff reported migraines for the last year, with pain reported as a 9 on a scale of 1-10, lasting 5-10 minutes, but requiring three or four days for full recovery. *Id*. Dr. Foote assessed Plaintiff with migraine and seizure disorder, and felt he was "doing much better on his current regimen" and would not need to see him for three months. Tr. 360. Dr. Foote did not add any additional medications for the headaches since they were so brief, but noted that the Topamax should help with the headaches. *Id*.

In February 2010, Dr. Bushman authored a letter stating that Plaintiff "suffers from a severe seizure disorder and migraine headaches and GERD. His neurologist Dr. Robert Foote, has concurred that he should not work any more at this point, that his seizures are uncontrolled basically. He still has them and is unable to work, and I agree." Tr. 361. Dr. Bushman also completed a Report of Illness or Physical Disability form, noting that Plaintiff was unable to work as of September 2007; and was advised in January 2010 to take time off from work for treatment and/or recovery. Tr. 436. Dr. Bushman found functional limitations consisting of marked limitations in the ability to maintain attention and concentration for extended periods and work in coordination with or proximity to others without being distracted, moderate limitations in the ability to make a simple work related decision and accept instructions and respond appropriately to criticism from supervisors, and slight limitations in the ability to respond appropriately to

1  changes in the work setting. Tr. 438-39. On average, Dr. Bushman noted that he

2  anticipated Plaintiff's impairments or treatment would cause him to be absent from work

3  more than three times a month. Tr. 439. In Dr. Bushman's opinion, Plaintiff was not

4  capable of performing a full-time job. *Id*.

5      In May 2010, Plaintiff reported to Dr. Foote that he had one or two minor seizures

6  since his last visit, but that he was incoherent for "a couple of days after." Tr. 367.  Dr.

7  Foote increased his Depakote dosage, and ordered blood tests. *Id*.

8      In September 2010 Plaintiff reported to Dr. Bushman that he had 12 seizures in the

9  past month, as well as chronic migraines. Tr. 373.

10     On January 17, 2011 Plaintiff was seen by Dr. Foote for a follow-up to a seizure

11 that occurred on January 12, 2011. Tr. 386. The seizure caused Plaintiff to stop breathing,

12 and he bit his tongue. Tr. 386, 411. Plaintiff was taken to Northern Cochise Community

13 Hospital where he was kept overnight. Tr. 386, 410-411. Despite the Depakote dosage

14 increase prescribed by Dr. Bushman, Plaintiff's Depakote levels were low and he was

15 given additional valproic acid intravenously and sent home. Tr. 386, 414. Plaintiff's wife

16 said he has been taking his Depakote regularly. Tr. 386. Dr. Foote noted that his seizures

17 seemed to be accompanied by low Depakote levels, and increased his dosage and planned

18 to take blood levels monthly. *Id*. Plaintiff's blood levels taken later that same month were

19 within range. Tr. 409.

20     In September 2011, Plaintiff established care with Dawn Walker, D.O. Tr. 429.

21 Plaintiff reported a history of seizures. Tr. 428. In October 2011, Plaintiff was seen by

22 Dr. Walker to complete disability paperwork. Plaintiff reported a history of seizure

23 disorder, not controlled, with medications managed by Dr. Foote. Tr. 426.  Dr. Walker

24 opined that Plaintiff would be absent from work two to three days a month due to seizure

25 and two to three days a month due to fatigue, and in an eight hour workday would be "off

26 task" due to fatigue for two hours. Tr. 435. In December 2011 Dr. Walker opined that

27 Plaintiff's seizures occurred monthly, and that his medications were at therapeutic levels,

28

but did not completely control his seizures. Tr. 433-434. In January 2013, Dr. Walker opined that he would be absent 1 to 15 days per month. Tr. 454.

*ii.   Examining Sources*

King Okiri, Psy.D., performed a consultative psychological evaluation of Plaintiff in March 2009. Tr. 326-331. At that time, Plaintiff reported to Dr. Okiri being unable to pay for his medications, and suffering from four to five seizures a day without medication. Tr. 326. Plaintiff reported last being in the hospital over ten years previous and denied being admitted to a hospital for seizures, and stated he was healthy with no record of ever going to the hospital. Tr. 328. Dr. Okiri noted that although Plaintiff was cooperative during the interview he appeared to be "trying to make himself look good," possibly due to the presence of his girlfriend during the interview. *Id*.

Dr. Okiri administered the Wechsler Adult Intelligence Scale - IV to Plaintiff to assess his reasoning and thinking ability and reported that Plaintiff put forth good effort and put forth the required effort but Plaintiff's overall psychological performance was poor. Tr. 328. Dr. Okiri assessed Plaintiff with "Cognitive Disorder NOS" and "Borderline Intellectual Functioning." Tr. 327. Dr. Okiri opined:

> [Plaintiff's] ability to understand and remember basic instructions would be moderately limited given the results of psychological verbal comprehension index score of 80. [Plaintiff's] ability to concentrate and persist at tasks at the workplace would be moderately limited given results of psychological testing. His interaction with the general public and coworkers would be mildly limited given the claimant's own statements. [Plaintiff's] ability to adapt to changes in the workplace would be moderately limited given his seizure disorder. If the severity of his seizures can be substantiated, then his ability to adapt to changes in the work environment would be markedly limited."

Tr. 329.

*iii.   Non-Examining State Agency Medical Sources*

Elieen Brady, M.D., completed a Physical Residual Functional Capacity Assessment form on January 31, 2009. Tr. 318-25. Dr. Brady concluded that Plaintiff could perform all work with limitations noted only for moderate exposure to hazards. *Id*.

Elizabeth Chiang, M.D., completed a Psychiatric Review Technique form based on Plaintiff's diagnoses of Cognitive Disorder and Borderline Intellectual Functioning. Tr. 336-48. In Paragraph "B" Criteria of the Listings, Dr. Chiang rated Plaintiff's functional limitations, finding mild restriction of activities of daily living, moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace, and insufficient evidence to determine episodes of decompensation. Tr. 346.

Dr. Chiang also completed a Mental Residual Functional Capacity Assessment form on March 16, 2009. Tr. 333-35. Dr. Chiang concluded that Plaintiff would be moderately limited in the ability to: understand and remember very short and simple instructions; understand and remember or carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Tr. 333-34.  Dr. Chiang completed a functional capacity assessment, concluding that "Claimant can understand, remember and carry out simple instructions, make simple decision, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors and respond appropriately to change in a routine work setting." Tr. 335.

1

*iv.  Other records and witnesses*

2    Plaintiff completed a seizure diary, recording four seizures that occurred in 2010,

3 all small or very small, and seven seizures that occurred during 2011, reporting one to

4 have been very large requiring hospitalization. Tr. 431-32. The diary noted his seizures

5 were witnessed by his wife. Tr. 431-32.

6

c.  The ALJ's Findings

7    The ALJ found that Plaintiff had not engaged in substantial gainful activity since

8 the date of application, September 25, 2008. Tr. 17, 18 ¶ 2. The ALJ found that Plaintiff

9 has the severe impairment of seizure disorder. Tr. 18, ¶ 2. The ALJ found that Plaintiff's

10 impairments, including his mental impairment, do not meet or equal a listed impairment.

11 *Id*., ¶ 3. The ALJ further found that in considering Plaintiff's mental impairment, the

12 "paragraph B" criteria were not satisfied because Plaintiff has no restrictions in his

13 activities of daily living; mild difficulties in social functioning, moderate difficulties with

14 regard to concentration, persistence or pace; and no episodes of decompensation which

15 have been of extended duration. Tr. 19. The ALJ found that Plaintiff failed to establish

16 that the "paragraph C" criteria are satisfied. *Id*. The ALJ stated that the RFC

17 determination reflected the degree of limitation the ALJ found in the "paragraph B"

18 mental function analysis. Tr. 19-20. The ALJ found that Plaintiff had the RFC to perform

19 a full range of work at all exertional levels, but with the following nonexertional

20 limitations: Plaintiff should avoid exposure to work hazards such as moving machinery

21 and unprotected heights; and is limited to simple, unskilled work. Tr. 20, ¶ 4.  The ALJ

22 found that Plaintiff had no past relevant work. Tr. 24, ¶ 5. At step five, the ALJ

23 considered Plaintiff's RFC in conjunction with the Medical-Vocational Guidelines, his

24 age, limited education and work experience, and testimony by a vocational expert that

25 there are jobs that exist in significant numbers in the national economy that Plaintiff can

26 perform, and concluded that Plaintiff is not disabled. Tr. 24-25, ¶¶ 6-10.

27

28

III.   Discussion

a.   Standard of Review

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Commissioner's decision to deny benefits "should be upheld unless it is based on legal error or is not supported by substantial evidence*." Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). In determining whether the decision is supported by substantial evidence, the Court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Id.* (quoting *Robbins v. Commissioner, Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).

Whether a claimant is disabled is determined using a five-step evaluation process. To establish disability, the claimant must show (1) he has not worked since the alleged disability onset date, (2) he has a severe impairment, and (3) his impairment meets or equals a listed impairment or (4) his residual functional capacity (RFC) precludes him from performing his past work. At step five, the Commissioner must show that the claimant is able to perform other work. *See* 20 C.F.R. §§ 416.920(a)-(g).

b.   Analysis

i.   *Treating Sources*

Plaintiff argues that the ALJ erred in not giving controlling weight to the opinions of Dr. Bushman, Dr. Foote, and Dr. Walker.  The Commissioner responds that the ALJ cited specific reasons supported by the evidence for discounting Dr. Bushman's opinion, as well as Dr. Foote's opinion. The Commissioner also asserts that the ALJ provided specific and legitimate reasons for finding that Dr. Walker's opinions were not entitled to controlling weight.

Generally, more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant*. See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *Winans v. Bowen*, 853 F.2d 643, 647 (9th

Cir. 1987). Medical opinions and conclusions of treating physicians are accorded special weight because these physicians are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to 'substantial weight.'"). If a treating doctor's opinion is not contradicted by another doctor (*i.e.*, there are no other opinions from examining or nonexamining sources), it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *See Ryan*, 528 F.3d at 1198; *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).

The ALJ accords "controlling weight" to a treating doctor's opinion where medically-approved, diagnostic techniques support the opinion and the opinion is not inconsistent with other substantial evidence. *See* 20 C.F.R. § 416.927(c)(2); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 n.10 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 632-33 (9th Cir. 2007). If the opinion is not accorded controlling weight, then the ALJ looks to a number of other factors in determining how much weight to give it. These factors include the length of the treatment relationship, frequency of examination, nature and extent of treatment relationship, evidence supporting the treating doctor's opinion, consistency of the opinion, and the doctor's specialization. *See* 20 C.F.R. § 416.927(c)(2)-(c)(6).

In February 2010 Dr. Bushman authored a letter stating that he agreed with Dr. Foote that Plaintiff should not work because his seizures were "uncontrolled basically." Tr. 361.[1] In May 2010 Dr. Bushman also reported that Plaintiff was unable to work as of

---

[1] Dr. Foote's opinion is presented only indirectly through the treatment notes and opinions of Dr. Bushman. *See* Tr. 379 (Dr. Bushman's treatment notes indicate Dr. Foote recommends that Plaintiff not work); Tr. 361 (Dr. Bushman's opinion indicates that Dr. Foote concurs that Plaintiff should not work, and that his seizures are uncontrolled). There is no independent opinion evidence from Dr. Foote in the record indicating he believed Plaintiff could not work. Because there is no separate opinion in the record from Dr. Foote, and because Plaintiff only argues that Dr. Foote's opinion in concurrence with Dr. Bushman was improperly rejected, the Court does not address this opinion as the separate opinion on the ultimate issue of disability by Dr. Foote.

September 2007, and noted functional limitations consisting of marked and moderate mental limitations. Tr. 437-40.

The ALJ acknowledged Dr. Bushman as Plaintiff's treating physician. Tr. 21. Treating physicians' uncontroverted "ultimate conclusions . . . must be given substantial weight; they cannot be disregarded unless clear and convincing reasons for doing so exist and are set forth in proper detail." *Embrey*, 849 F.2d at 422. Although the ALJ "'is not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability, . . . he cannot reject them without presenting clear and convincing reasons for doing so.'" *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (quoting *Montijo v. Sec'y of Health & Human Servs.*, 729 F.2d 599, 601 (9th Cir. 1984) (per curiam)); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (stating that "reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion"); *Lester*, 81 F.3d at 830. When rejecting the opinion of a treating physician, the ALJ can meet this "'burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008)(quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). The Social Security Administration has explained that an ALJ's finding that a treating source medical opinion is not well-supported by medically acceptable evidence or is inconsistent with substantial evidence in the record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. *Orn*, 495 F.3d at 632 (citing 20 C.F.R. § 404.1527). Treating source medical opinions are still entitled to deference and, "[i]n many cases, will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Orn*, 495 F.3d at 632; *see also Murray*,722 F.2d at 502 ("If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.").

The ALJ gave minimal weight to Dr. Bushman's opinions regarding Plaintiff's ability to work because the opinions were "in direct contrast to his own opinions and treatment record, as well as other evidence of record." Tr. 22. The ALJ noted specifically that Dr. Bushman had authored contradictory opinion letters regarding Plaintiff's ability to work, and had "relied quite heavily on the subjective report of symptoms and limitations" provided by the Plaintiff, uncritically accepting Plaintiff's reports as true, when there "exists good reasons for questioning the reliability of the [Plaintiff's] subjective complaints. Tr. 22.

Plaintiff argues that the ALJ did not cite to any specific "other evidence of record" in support of his conclusion. Contrary to this assertion, the ALJ specifically noted that there was no recent mention of headache or seizures in the treatment records from 2010. Tr. 22.  The ALJ's conclusion finds support in the record.

Dr. Bushman's treatment notes indicated that from May 2008 to September 2009, when Dr. Bushman began treating Plaintiff, Plaintiff reported having 3 seizures. In October and November 2009, Plaintiff reported having fewer seizures. Tr. 381. In December 2009 and February 2010, although he had several visits with Dr. Bushman, Plaintiff did not report any seizures. Tr. 378-80. In March 2010, Plaintiff told Dr. Bushman only that "his seizures [were] occurring every once in a while." Tr. 378. In May 2010, Plaintiff saw Dr. Foote, reporting only one or two "minor seizures" since his last visit five months prior. Tr. 367. Although Plaintiff saw Dr. Bushman in May 2010, Dr. Bushman did not note any recent seizures and only stated that Plaintiff "had a lot of paperwork . . . regarding disability which we filled out together." Tr. 376. This treatment note is in direct contrast to Plaintiff's assertion that Dr. Bushman noted seizure activity on each clinical visit. *See* Doc. 18, at 7; Tr. 379 (treatment notes from February 18, 2010, indicating problems with insomnia, but no reported seizure activity). Finally, although Plaintiff reported in September 2010 having 12 seizures the previous month, (Tr. 373), this appointment was after Dr. Bushman authored both of his opinions, and was contrary

to Plaintiff's report in his seizure diary of only having four seizures throughout 2010. Tr. 430-31.

The ALJ reasonably concluded that Dr. Bushman's extreme May 2010 opinion indicating that Plaintiff's "uncontrolled" seizure disorder would completely preclude any work activity was unsupported by Dr. Bushman's treatment record, Dr. Bushman's opinion stating that Plaintiff could work, and other evidence of record (Tr. 22). *See* 20 C.F.R. § 416.927(c)(4) (greater weight given to opinions that are consistent with the record as a whole); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (discrepancy between treating doctor's opinion and his notes and other opinions regarding claimant's capabilities provided a clear and convincing reason for not relying on the doctor's opinion).

Plaintiff argues that the ALJ offered only conclusions without citation to specific, legitimate reasons supported by substantial evidence in support of his conclusions. *See* Doc. 18, at 7. Contrary to this allegation, the ALJ specifically noted specific instances in the record where, at Plaintiff's request, Dr. Bushman authored opinions indicating that Plaintiff both could and could not work. *See* Tr. 22 (comparing Exhibit B17F/3 with Exhibit B24F). Additionally, the ALJ noted that Dr. Bushman "relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff] and seemed to uncritically accept as true, most, if not all" of what Plaintiff reported despite the existence of "good reasons for questioning the reliability of [Plaintiff's] subjective complaints." Tr. 22. Indeed, Dr. Bushman's physical examinations of Plaintiff were mostly normal, there were few clinical findings, and Dr. Bushman appeared to rely mainly on Plaintiff's subjective reports (*e.g.*, Tr. 363, 378, 380-82). Therefore, the ALJ appropriately found that Dr. Bushman's assessment was based on Plaintiff's subjective complaints (which the ALJ found not fully credible), because his treatment notes did not generally support the extreme limitations he assessed. *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); *id.* § 416.927(c)(4)

(ALJ must consider consistency of opinion with record). The Ninth Circuit has held that "[a] physician's opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted." *Morgan v. Commisioner of Social Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (internal quotations and citations omitted); *see also Fleming v. Commissioner of Social Sec. Admin.*, 500 Fed.Appx. 577 (9th Cir. 2012) (ALJ reasonably discounted opinion of examining physician which was internally inconsistent and based on claimant's subjective complaints which the ALJ had separately rejected as unreliable, and there was little clinical support for those findings). As discussed below, there was no error in the ALJ's findings that Plaintiff's subjective complaints were not entirely credible.

Plaintiff also asserts that the ALJ failed to give controlling evidentiary weight to Plaintiff's treating neurologist, Dr. Foote. (*See* Doc. 18, at p. 8.) Plaintiff refers to no independent opinion evidence in the record from Dr. Foote. Presumably, Plaintiff's argument rests on Dr. Bushman's assertion that Dr. Foote concurred with Dr. Bushman's opinion that Plaintiff should not work. Tr. 361. It is not clear from the record that Dr. Bushman's statement that Dr. Foote concurred with his assessment was based on communications between Dr. Bushman and Dr. Foote, or based on Plaintiff's report to Dr. Bushman of Dr. Foote's assessment. The source of the assertion was not established, and there is no opinion in the record from Dr. Foote on the issue of disability. Regardless, for the reasons stated above, the ALJ did not err in rejecting the opinion evidence submitted by Dr. Bushman even if it is also considered to be the opinion of Dr. Foote. At the time Dr. Bushman wrote the letter stating Dr. Foote concurred with his opinion that Plaintiff could not work, Dr. Foote had treated Plaintiff only one time, noting in January 2010 that Plaintiff had not had a seizure since October 2009. This is substantial evidence supporting the ALJ's decision. Additionally, to the extent the ALJ addressed Dr. Foote's medical opinion, the ALJ's interpretation of Dr. Foote's treatment notes is supported by the record, and supports the ALJ's ultimate conclusion. The ALJ noted that Dr. Foote

- 17 -

first treated Plaintiff for migraines and seizures in January 2010. Tr. 21-22. At that time, Plaintiff reported having had his last seizure in October 2009. Tr. When Plaintiff returned to Dr. Foote in May, 2010, Plaintiff reported having only one or two minor seizures since his visit in January. Plaintiff next saw Dr. Foote after having a major seizure that occurred on January 12, 2011.Tr. 386-87. These treatment notes suggest that Plaintiff reported only four seizures to Dr. Foote over the course of more than a year. This supports the ALJ's conclusion that although Plaintiff had a medically determinable impairment, the alleged severity of the seizures was not substantiated by the evidence of record.

Finally, the Plaintiff argues that the ALJ erred by not giving controlling weight to the opinion of Dr. Walker, Plaintiff's treating physician from September 2011 through January 2013. Tr. 424-35. In December 2011, Dr. Walker opined that Plaintiff would be absent from work two to three days a month due to seizure and two to three days a month due to fatigue, and in an eight hour workday would be "off task" due to fatigue for 2 hours. Tr. 435. Dr. Walker stated that Plaintiff's seizures occurred monthly, and that his medications were at therapeutic levels, but did not completely control his seizures. Tr. 433-434. In January 2013, Dr. Walker opined that he would be absent 1 – 15 days per month. Tr. 454.

The ALJ gave minimal weight to Dr. Walker's opinion because Dr. Walker's treatment notes indicated that she was not treating Plaintiff for his seizure disorder, but that Dr. Foote was Plaintiff's treating physician managing his care for seizure disorder. Tr. 22. Additionally, the ALJ noted that Dr. Walker's assessment was inconsistent with her own treating records as she did not have a treating relationship regarding Plaintiff's seizures. Tr. 22.

The ALJ provided specific and legitimate reasons supported by substantial evidence in the record for finding that Dr. Walker's opinion was not entitled to controlling weight. The medical evidence of record indicates that prior to Dr. Walker's December 2011 opinion, Plaintiff was seen by Dr. Walker once to establish care and treat

1    a rash, at which time he reported a history of seizure disorder, but did not report any
2    recent seizures to Dr. Walker (Tr. 428-29), a second time to have Dr. Walker fill out
3    disability paperwork to establish disability due to seizure disorder (Tr. 426-27), and
4    finally, a third time to treat a laceration on his arm (Tr. 424-25).

5         Thus, the ALJ properly concluded that Dr. Walker's very limited treatment notes
6    did not support Dr. Walker's opinion on the issue of disability.

7                              *ii.  Examining Source*

8         Plaintiff asserts that the ALJ failed to comply with the Appeals Council remand
9    order directing the ALJ to evaluate and weigh the opinion of consultative examiner Dr.
10   Okiri. (Doc. 18, at 8.) The Commissioner correctly asserts that the ALJ reasonably
11   complied with the Appeals Council's order.

12        After the first hearing, the ALJ issued a decision denying benefits. Tr. 83-88.  The
13   Appeals Council vacated the ALJ's decision and remanded the case to the ALJ with
14   directions to address and evaluate Dr. Okiri's March 2009 opinion, and further evaluate
15   Plaintiff's mental impairments in light of that opinion. Tr. 91. The Appeals Council noted
16   that although the ALJ addressed this opinion, "no rationale or evidentiary basis was given
17   for rejecting this medical source opinion" as required by regulations. Tr. 91. Additionally,
18   the Appeals Council "further observed that the State Agency concurred with Dr. Okiri's
19   opinion finding that the claimant had mental impairments that would limit the claimant to
20   performing only simple tasks." Tr. 91. The Appeals Council noted that this medical
21   opinion was also not evaluated in accordance with Social Security Ruling 96-6p. Tr. 91.

22        Despite Plaintiff's argument that the ALJ disregarded the Appeals Council's
23   directions, it is evident that the ALJ considered the opinions because in the  ALJ's second
24   decision the ALJ included limitations in the RFC of "simple and unskilled work,"
25   reflecting the medical opinions of Dr. Okiri and Dr. Chiang.[2] The ALJ's failure to explain

26   _____

27        [2] By denying review of the ALJ's second decision, the Appeals Council also
     implicitly rejected Plaintiff's argument that the ALJ erred in the second decision by
28   failing to discuss the weight given to the opinions of Dr. Okiri and Dr. Chiang. *See* Tr. 1-
     2, 10.

1   the weight given to Dr. Okiri's opinion was inconsequential to the ultimate determination

2   of nondisability and is therefore harmless.

3          The harmless error rule, as codified, requires us to "give judgment after an

4   examination of the record without regard to errors or defects which do not affect the

5   substantial rights of the parties." *Ludwig v. Astrue*, 681 F.3d 1047, 1053 n.2 (9th Cir.

6   2012)(citing 28 U.S.C. § 2111; *Molina v. Astrue*, 674 F.3d 1104, 1118 (9th Cir.2012);

7   *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011)(acknowledging that the harmless

8   error rule that courts ordinarily apply in civil cases applies to Social Security cases as

9   well). An ALJ's error is harmless only where it is "inconsequential to the ultimate

10  nondisability determination." *Molina*, 674 F.3d at 1115 (quoting *Carmickle v.

11  Commissioner, Social Sec. Admin.*, 533 F.3d at 1155, 1162 (9th Cir. 2008); *Tommasetti*,

12  533 F.3d at 1038; *Robbins*, 466 F.3d at 885; *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d

13  1050, 1055 (9th Cir. 2006)).

14         To the extent the ALJ omitted an explanation of the weight given to the opinions

15  of the consultative examiner and State Agency reviewing physician, this omission was

16  not *per se* prejudicial. *Cf. Molina*, 674 F.3d at 1121-22 (rejecting a *per se* rule of

17  prejudice when the ALJ fails to discuss evidence); *see also Shinseki v. Sanders*, 556 U.S.

18  396, 409 (2009) (rejecting a legal framework that would "prevent the reviewing court

19  from directly asking the harmless-error question," and that would justify "reversing for

20  error regardless of its effect on the judgment" (citation and internal quotes omitted)).

21         As the ALJ explained in his decision, the limitations identified by the ALJ in the

22  paragraph B criteria are not an RFC assessment, but are used to rate the severity of

23  mental impairments at steps two and three of the sequential evaluation process. The RFC,

24  which is assessed before going from step three to step four, requires a more detailed

25  assessment by itemizing various functions contained in the broad categories found in

26  paragraphs B and C of the Listing of Impairments. *See* 20 C.F.R. §416.920a; SSR 96-8p,

27  1996 WL 374184, at *4. As correctly noted by the Commissioner, Dr. Chiang reviewed

28  Dr. Okiri's sieverity ratings and concluded that Plaintiff was capable of understanding,

remembering, and carrying out simple instructions, making simple decisions, attending and concentrating for two hours at a time, interacting adequately with co-workers and supervisors, and responding appropriately to changes in a routine work setting. Thus, in light of Dr. Okiri's and Dr. Chiang's opinions, the ALJ reasonably limited Plaintiff to simple, unskilled work.

### iii.  Plaintiff's Credibility

Lastly, Plaintiff argues that the ALJ's reasoning for finding Plaintiff's credibility diminished was improperly vague, and that the ALJ did not articulate any "specific findings" for discounting the complaints of disabling pain and limitations. (Doc. 18, at 10.)

"[Q]uestions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (internal quotation marks and citation omitted); *see also Allen v. Heckler*, 749 F.2d 577, 580 n.1 (9th Cir. 1985). "The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750; *see also Lingenfelter*, 504 F.3d at 1035-36. The ALJ's credibility findings must be supported by specific, cogent reasons. *See Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990).

Where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be specific, clear and convincing. *Tomasetti v. Astrue*, 533 F.3d 1035 (9th Cir. 2008); *Orn*, 495 F.3d at 635; *Robbins*, 466 F.3d at 883. Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn*, 495 F.3d at 635 (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). When assessing a claimant's credibility, however, the "ALJ is not required to believe

every allegation of disabling pain or other non-exertional impairment." *Orn*, 495 F.3d at 635 (internal quotation marks and citation omitted). Additionally, the ALJ may disregard self-serving statements if they are unsupported by objective evidence. *Rashad*, 903 F.2d at 1231.

In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Lingenfelter*, 504 F.3d at 1040; *Smolen*, 80 F.3d at 1284;  *see also Robbins*, 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (*e.g.*, reputation for dishonesty), on conflicts between his testimony and his own conduct; or on internal contradictions in that testimony.")

Contrary to the Commissioner's contention, *Bunnell v. Sullivan*, 947 F.2d 341 (9th Cir. 1991), does not permit finding subjective symptom testimony not credible without articulating clear and convincing reasons. The Commissioner correctly quotes *Bunnell* as stating an ALJ must make specific findings, supported by the record, to support his conclusion that a claimant's allegations of severity are not credible. *See id.* at 345. But *Bunnell* does not address whether the reasons must be clear and convincing. Rather, it addresses whether an ALJ may discredit a claimant's allegations of the severity of pain solely on the ground that the allegations are unsupported by objective medical evidence.

An ALJ's error may be harmless where the ALJ has provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009); *Carmickle*, 533 F.3d at 1162–63; *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195–97 (9th Cir. 2004). In this context, an error is harmless so long as

1    there remains substantial evidence supporting the ALJ's decision and the error "does not

2    negate the validity of the ALJ's ultimate conclusion." *Batson*, 359 F.3d at 1197; *see also*

3    *Carmickle*, 533 F.3d at 1162.

4           The ALJ found Plaintiff's "medically determinable impairments could reasonably

5    be expected to produce the alleged symptoms; however, the claimant's statements

6    concerning the intensity, persistence and limiting effects of these symptoms are not

7    credible to the extent they are inconsistent with the above residual functional capacity."

8    Tr. 20. As the Seventh Circuit Court of Appeals explains, the manner in which this

9    "boilerplate language" is used in the Commissioner's credibility analysis "gets things

10   backwards." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (Addressing identical

11   language and finding that the "problem is that the assessment of a claimant's ability to

12   work will often … depend heavily on the credibility of her statements concerning the

13   'intensity, persistence and limiting effects' of her symptoms, but the passage implies that

14   ability to work is determined first and is then used to determine the claimant's

15   credibility.")

16          As the Court found in *Bjornson*, the statement by the ALJ that Plaintiff's

17   statements were "not entirely credible" yields no clue to what weight the ALJ gave that

18   testimony, and "fails to inform us in a meaningful, reviewable way of the specific

19   evidence the ALJ considered in determining that claimant's complaints were not

20   credible." *Id.* (citations omitted).

21          If, however, "the ALJ has made specific findings justifying a decision to

22   disbelieve an allegation … and those findings are supported by substantial evidence in

23   the record, our role is not to second-guess that decision." *Morgan*, 169 F.3d at 600.

24   Several courts in this Circuit have found that the mere use of the meaningless boilerplate

25   language is not cause for remand if the ALJ's conclusion is followed by sufficient

26   reasoning. *See e.g. Jones v. Comm. of Soc. Sec.*, 2012 WL 6184941, at * 4 (D.Or.

27   2012)(boilerplate language is a conclusion which may be affirmed if the ALJ's stated

28   reasons for rejecting the plaintiff's testimony are clear and convincing); *Bowers v. Astrue*,

2012 WL 2401642, at *9 (D.Or. 2012)(concluding that this language erroneously reverses the analysis, but finding such error harmless because the ALJ cited other clear and convincing reasons for rejecting the claimant's testimony). The Court adopts this reasoning, and, despite the use of the boilerplate language which implies improper analysis, considers whether the ALJ's conclusion in this case is nonetheless supported by clear and convincing evidence.

The ALJ identified the testimony of the Plaintiff's that he was considering, stating that the Plaintiff complained of "severe seizure symptoms." Tr. 23. Although Plaintiff claimed that he experienced severe seizure symptoms, including three to four seizures per week with two to three days of recovery time after each seizure (Tr. 65-67), the ALJ reasonably found that the evidence as a whole suggested that Plaintiff's impairments were not as severe as he alleged (Tr. 20-24).

First, the ALJ found that Plaintiff's treating physicians consistently characterized the impairments as "minimal", mild", "slight", "normal", and "unremarkable" with reference to the clinical and laboratory findings. Tr. 23.  This finding is consistent with the records from Plaintiff's treating physicians which indicated relatively few significant seizures.

Second, the ALJ noted a number of inconsistencies which cast doubt regarding the credibility of Plaintiff's testimony. Tr. 23. Significantly, Plaintiff's testimony that he was having three to four seizures a week was at odds with the seizure diary he kept, and with the number of seizures he reported to his treating physicians. The only report in the medical record of seizures occurring that frequently was from Dr. Okiri's evaluation in 2009, where Plaintiff reported, again inconsistently with his reports to his treating physicians, four to five seizures a day. Tr. 326.

The ALJ noted that there were large gaps of time between visits to the doctor seeking relief. This is substantiated by the treatment notes. In 2010, when Plaintiff reported his seizures were becoming more frequent, he saw his neurologist only twice. Tr. 361, 367.

The ALJ noted that Plaintiff maintained a somewhat normal level of activity and interaction, observing Plaintiff was independent in self-care, able to cook, clean, do laundry and yard work, wash dishes, grocery shop, take walks, visits friends and relatives, play cards, and read the newspaper (Tr. 23; *see* Tr. 45-46, 203-05). This is supported by Plaintiff's disability report which stated that Plaintiff is able to cook, clean house, pick up trash, go on car trips, and shop (Tr. 242-43) as well as his testimony from the hearing in October 2010 that, despite having seizures two to three times a week (Tr. 44) he spends the day watching his infant daughter. Tr. 45. The ALJ's credibility finding was further bolstered by evidence that Plaintiff was staying home to care for his young daughter (Tr. 22; see Tr. 45, 386). Thus, the ALJ reasonably found that the activities reported by Plaintiff undermined his allegations of severe seizures that left him completely incapacitated for days (Tr. 23). *See* 20 C.F.R. § 416.929(c)(3)(i) (ALJ must consider evidence of activities); *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (ALJ properly discredited claimant by identifying contradictions between his complaints in an activity questionnaire, his hearing testimony, and some of his other self-reported activities). Contrary to Plaintiff's assertion, this was entirely appropriate. See *Morgan*, 169 F.3d at 600 (ability "to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting" can be used to discredit a plaintiff).

Finally, the ALJ noted that there were numerous references in the medical evidence indicative of Plaintiff's non-compliance with the medical treatment specified by the physicians. Tr. 23.  This statement is supported by the record. In October 2007, Plaintiff received emergency treatment for a seizure, but reported that he had missed recent doses of his medication Tr. 291-92. In December 2008, Plaintiff was not taking Depakote as prescribed, and his physician prescribed a once-daily Depakote dose to improve compliance.  Tr. 310. Further, Plaintiff's lab results often showed that Plaintiff's Depakote levels were very low. Tr. 311, 365, 382. When Plaintiff received emergency treatment for a seizure in January 2011, it was noted that he had a "sub therapeutic

1   Depakote level" and Dr. Foote later opined that Plaintiff's "seizures seem to be
2   accompanied by low Depakote levels" (Tr. 22; see Tr. 386, 411). Thus, the ALJ
3   reasonably determined that Plaintiff's failure to comply with his prescribed course of
4   treatment suggested that his limitations were not actually as disabling as he alleged.

5       Plaintiff submits that the ALJ erred by noting that Plaintiff's "history of
6   incarceration does not tend to increase his credibility." (Doc. 18 at 11, see Tr. 24.)
7   Consideration of evidence of prior incarceration, particularly for a crime of moral
8   turpitude, is not error, and may constitute clear and convincing reasons for discounting a
9   social security claimant's testimony. *See Stewart v. Colvin*, 2014 WL 1355972, at *5
10  (D.Ariz. 2014)("evidence of prior incarceration, particularly for a crime of moral
11  turpitude is a clear and convincing reason for discounting a social security claimant's
12  testimony."); *McKnight v. Comm'r of Social Sec.*, WL 3773864, at *10 (E .D.Cal. Jul. 17,
13  2013) ("An ALJ may rely upon a claimant's convictions for crimes of moral turpitude as
14  part of a credibility determination.") (citation omitted); *see also Hardisty v. Astrue*, 592
15  F.3d 1072, 1080 (9th Cir. 2010) (in ruling on an Equal Access to Justice Act request, the
16  Court held the ALJ's credibility determination was substantially justified when it was
17  based, among other factors, on the claimant's prior criminal convictions). Plaintiff
18  testified that he was incarcerated for violating his probation and was put on probation for
19  committing the crime of sexual abuse. Tr. 43. Consequently, the ALJ's consideration of
20  Plaintiff's criminal history was proper and supports the ALJ's adverse credibility
21  determination.

22      The adverse credibility finding is also supported by the ALJ's evaluation of the
23  medical record. Assessing a plaintiff's testimony regarding the severity of his
24  impairments depends on the medical evidence. *See Chaudhry v. Astrue*, 688 F.3d 661,
25  670 (9th Cir. 2012) ("Because the RFC determination must take into account the
26  claimant's testimony regarding his capability, the ALJ must assess that testimony in
27  conjunction with the medical evidence."). As discussed above, the medical evidence
28  supported the ALJ's refusal to find Plaintiff disabled based on the records of his treating

physicians. That same evaluation applies to the evaluation of Plaintiff's testimony. Considered in tandem, the ALJ's findings that Plaintiff's activities of daily living and the lack of objective medical evidence of disability undermined his credibility are clear and convincing because they were supported by "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [the Plaintiff's] testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (citations omitted). As such, the ALJ properly discounted Plaintiff's subjective complaints.

## IV.    Recommendation

This Court recommends that the District Court, after its independent review of the record, enter an order affirming the decision of the Commissioner and denying benefits.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within fourteen days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Fed.R.Civ.P. 72(b). **No reply to any response shall be filed**. *See id.* If objections are filed the parties should use the following case number: **CV 13-0255-TUC-JGZ.**

If objections are not timely filed, then the parties' right to de novo review by the District Court may be deemed waived.

Dated this 14th day of July, 2014.

Bernardo P. Velasco
United States Magistrate Judge